**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE**

**CIVIL ACTION NO. 04-310-DLB**

**JOHNNY BRANHAM**                                                             **PLAINTIFF**

vs.                       **<u>MEMORANDUM OPINION & ORDER</u>**

**JO ANNE B. BARNHART, Commissioner**
**SOCIAL SECURITY ADMINISTRATION**                                 **DEFENDANT**

*******************

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of an administrative decision of the Commissioner of Social Security. The Court, having reviewed the record, will affirm the Commissioner's decision, as it is supported by substantial evidence.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Johnny Branham filed an application for Disability Insurance Benefits (DIB) on February 19, 2003. (Tr. 90-92). Plaintiff, who was 45 years old at the time of the last hearing, has a high school education. (Tr. 103). He alleges disability beginning on September 27, 2002, due to hearing problems, sleep apnea, busted discs in his back, nerve damage to his right leg, numbness of his right foot toes, and right hip problems. (Tr. 97).

Plaintiff's application was denied initially (tr. 50-53) and upon reconsideration (tr. 57-59). He then requested a hearing before an administrative law judge (ALJ). The first hearing was held on October 15, 2003, in Prestonsburg, Kentucky. (Tr. 400-24). A

supplemental hearing was held on January 12, 2004, after Plaintiff underwent a consultative examination. (Tr. 425-36). Plaintiff then submitted evidence of a mental impairment, necessitating a psychiatric file review by Dr. Elliott Spanier, as well as another hearing. A third hearing was held on March 8, 2004. (Tr. 437-52). Plaintiff then requested Dr. Spanier's attendance at the hearing, necessitating a fourth hearing, which was held on April 19, 2004, in Huntington, West Virginia. (Tr. 453-74). By written decision dated June 7, 2004, the ALJ ruled that Plaintiff was not under a disability, and was ineligible for disability benefits. (Tr. 21-28). This decision was ultimately upheld by the Appeals Council on September 4, 2004, despite the Council's consideration of additional information submitted by Plaintiff. (Tr. 7-10).

The instant action was filed on August 31, 2004. The matter has now culminated in cross motions for summary judgment.

## II. DISCUSSION

**A.    Overview of the Process**

Judicial review of the Commissioner's decision is restricted to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *See Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994). "Substantial evidence" is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Courts are not to conduct a *de novo* review, resolve conflicts in the evidence, or make credibility determinations. *See id.* Rather, we are to affirm the Commissioner's decision, provided it is supported by substantial evidence, even

if we might have decided the case differently.  *See Her v. Comm'r of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999).

The ALJ, in determining disability, conducts a five-step analysis.  Step 1 considers whether the claimant is still performing substantial gainful activity; Step 2, whether any of the claimant's impairments, or combination thereof, are "severe"; Step 3, whether the impairments meet or equal a listing in the Listing of Impairments; Step 4, whether the claimant can still perform his past relevant work; and Step 5, whether significant numbers of other jobs exist in the national economy which the claimant can perform.  As to the last step, the burden of proof shifts from the claimant to the Commissioner.  *See Jones v. Comm'r of Social Security,* 336 F.3d 469, 474 (6th Cir. 2003); *Preslar v. Sec'y of Health & Human Servs.,* 14 F.3d 1107, 1110 (6th Cir. 1994).

**B.    The ALJ's Determination**

At Step 1, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any relevant time.  (Tr. 22).  At Steps 2 and 3, the ALJ found that Plaintiff's obesity, high frequency hearing loss, back problems, and depression constitute severe impairments. (*Id.*).  The ALJ concluded, however, that Plaintiff does not have an impairment or combination of impairments that meet or medically equal any listed impairment found in Appendix 1 to Subpart P of Regulations No. 4.  (Tr. 23-24).

At Step 4, the ALJ found that Plaintiff retained the physical residual functional capacity (RFC) to perform medium level work.  Specifically, the ALJ found that Plaintiff can lift and carry up to 50 pounds occasionally and 25 pounds frequently; occasionally climb, stoop, crouch, kneel and crawl; must avoid concentrated exposure to vibration; and must wear hearing protection when exposed to loud noises.  (Tr. 25, 27).  With respect to his

mental impairments, the ALJ found Plaintiff to have poor ability to understand, remember and carry out detailed and complex job instructions, demonstrate reliability, and behave in an emotionally stable manner; and fair ability to deal with work stresses, relate to coworkers, deal with the public, use judgment, interact with supervisors, function independently, maintain attention/concentration, relate predictably in social situations, follow work rules, maintain personal appearance and understand, remember, and carry out simple job instructions. (Tr. 25-26, 27-28). Based upon these findings, the ALJ determined that Plaintiff was unable to perform his past relevant work as an undercarriage builder. (Tr. 26).

The ALJ, therefore, proceeded to the final step of the sequential evaluation. At Step 5, the ALJ found that there are jobs existing in significant numbers in the national economy that Plaintiff could perform. These include hand packer and janitor at the medium level of exertion, price marker and rating worker at the light level of exertion, and assembler and grader/sorter at the sedentary level of exertion. (Tr. 27). This conclusion resulted from testimony by a vocational expert ("VE"), in response to hypothetical questions assuming a person of Plaintiff's age, education, past relevant work experience, and RFC. (Tr. 471-72).

**C.   Analysis**

Plaintiff raises two arguments on appeal. First, he maintains the ALJ failed to properly weigh the medical evidence. Specifically, Plaintiff argues that the ALJ rejected the opinions of treating sources in favor of one-time examining or non-examining sources. Second, Plaintiff maintains that the ALJ erred in failing to find that his mental impairment meets or equals Listing 12.04 (affective disorders). In response, the Commissioner argues

4

that the ALJ properly evaluated Plaintiff's physical and mental impairments, and the related medical evidence. The Commissioner also argues that Plaintiff failed to present evidence that he satisfies the "B" or "C" criteria of Listing 12.04. For the reasons that follow, the Court finds that Plaintiff's alleged errors are without merit.

As noted by the medical expert retained by the ALJ, the medical evidence in this case is conflicting to say the least. The Court will begin with the medical evidence relating to Plaintiff's physical impairments. In his application, Plaintiff alleged disability due to problems with his back, nerve damage in his right foot, numbness in his right foot, and problems with his right hip. (Tr. 97). At the first hearing, he complained of bursitis in his right shoulder and pain in his hand, which he speculated was broken. (Tr. 407). He also testified that he injured his back at work in February 1997. (Tr. 406). Following his work-related injury, Plaintiff was initially seen by his employer's physician, Dr. Larry Coleman. (Tr. 330). Plaintiff underwent an MRI of his lumbar area on March 11, 1997, which revealed herniated discs at the L2-L3 and L4-L5 levels. (Tr. 332). Dr. Richard Mortara recommended surgery, but Plaintiff opted instead to seek treatment at a pain management clinic. (*Id.*). When that proved unsuccessful, he sought a second opinion from Dr. Phillip Hylton, a neurosurgeon, who counseled against surgical intervention.[1] (*Id.*).

Thereafter, Plaintiff sought treatment from his family physician, Dr. Samuel King. Treatment was generally conservative (Tr. 324), and consisted of medication (Bextra, Lortab Neurontin, Vioxx), ice/heat, pillow supports, back care techniques and mechanics,

---

[1] Dr. Hylton requested a second MRI on July 14, 1998, which revealed moderate diffuse disc bulge at the L4-L5 level with moderate bilateral neural foraminal stenoses, and moderate diffuse disc bulge at the L2-L3 level with moderate compromise of the left L2-L3 neural foramen. (Tr. 328). A myelogram and post-myelogram CAT scan revealed no obvious HNP. (Tr. 326).

a home exercise regimen, and restrictions. (Tr. 244-48, 308-27). Dr. King also repeatedly encouraged Plaintiff to lose weight, advice that Plaintiff failed to heed. (Tr. 310-19). Dr. King gave Plaintiff a Medrol Dosepak, which he did not take, and recommended a visit to the Louisville Spine Center, which Plaintiff declined due to the long car ride. (Tr. 316). The record reveals that Plaintiff saw Dr. King from October 1998 until August 2002. Based upon this evidence, the ALJ found that Plaintiff has a severe back impairment. (Tr. 22).

Pertinent to this appeal, Dr. King supplied two identical functional capacity assessments. In those assessments - dated October 10, 2003 and February 26, 2004, respectively - Dr. King opined that Plaintiff:

> can lift/carry 20 pounds occasionally, 10 pounds frequently; stand/walk for a total of less than 3 hours; sit a total of less than 3 hours; is limited in his ability to push/pull, reach, and handle; can occasionally stoop, kneel, crawl, and crouch; and never climb or balance; and must avoid heights, machinery, temperature extremes, humidity, and vibration.

(Tr. 305-06, 370-71). Mentally, Dr. King opined that Plaintiff has a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, maintain attention and concentration, understand, remember, and carry out simple job instructions, and maintain his personal appearance; and a poor ability to understand, remember, and carry out complex and detailed job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. 307, 372).

Plaintiff also underwent a consultative physical examination by Dr. Christa Muckenhausen on August 26, 2003. (Tr. 285-99). Dr. Muckenhausen imposed even greater physical restrictions, limiting Plaintiff to lifting/carrying 20 pounds occasionally, 10 pounds frequently; standing, walking, and sitting for a total of 2 hours, 15 minutes without

6

interruption; and never climbing, balancing, stooping, crouching, kneeling, or crawling. (Tr. 285-86). She also opined that Plaintiff's ability to reach, handle, feel, push/pull, see, and hear are limited; and that he should avoid heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibration. (Tr. 286). Mentally, Dr. Muckenhausen stated that Plaintiff has a poor ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, and maintain attention and concentration. (Tr. 287).

Finally, two state agency reviewers supplied physical RFC assessments, in which they restricted Plaintiff to lifting/carrying 50 pounds occasionally, 25 pounds frequently; standing/walking/sitting for a total of 6 hours in an 8-hour workday; occasionally climbing ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling; and avoiding concentrated exposure to vibration. (Tr. 249-56, 273-80). Another consultative examiner, Dr. Bobby Kidd, imposed no physical restrictions. (Tr. 346-53).

The ALJ discussed these conflicting assessments in his written decision. Ultimately, he rejected the assessments provided by Drs. King and Muckenhausen in favor of those provided by the state agency physicians. (Tr. 25). In support, the ALJ stated that neither King nor Muckenhausen provided objective data to support their highly restrictive opinions. (*Id*.). Moreover, the ALJ noted that Dr. King's assessment was inconsistent with his treatment records, which indicated that Plaintiff had normal motor function, no neurological deficits, and normal test results (myelogram, EMG, NCV). (*Id*.). Finally, the ALJ noted that Plaintiff continued working after his injury, did not try therapy or other pain management, and only saw Dr. King sporadically since his alleged onset date, in determining Plaintiff's RFC. According to Plaintiff, this was error.

Though not invoked by name, Plaintiff is arguing what is commonly referred to in disability proceedings as the "treating physician rule." Under that rule, an ALJ must give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *See* 20 C.F.R. § 404.1527(d)(2). If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion. *Id.*; *Wilson v. Comm'r of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004). The regulation also contains a clear procedural requirement: the ALJ must always give good reasons in his written decision for the weight he gives to a treating source's opinion. *Id.*

In this case, the Court concludes that the ALJ did not run afoul of the "treating physician" rule in rejecting Dr. King's and Dr. Muckenhausen's opinions.[2] He expressly noted that the opinions were not well-supported by objective data; and with respect to Dr. King specifically, his opinions were inconsistent with his treatment records. The ALJ also considered the factors outlined in 20 C.F.R. § 404.1527(d)(2), namely the frequency of examination ("sporadic") and the nature and extent of the treatment relationship ("conservative" and limited to primarily medications). Finally, the Court notes that Dr. King is a family practitioner, and as such, is not a specialist in his respective field. For all these

---

[2] As a one-time consultative examiner, the ALJ was not required to give controlling weight to Dr. Muckenhausen's opinion.

8

reasons, the Court finds that the ALJ properly evaluated the conflicting medical evidence relating to Plaintiff's physical impairments.

Plaintiff also alleges that the ALJ improperly weighed the medical evidence relating to his mental impairment (i.e., depression). Specifically, he cites to the opinion of consultative psychiatric examiner Dr. Eric Johnson, and his treatment notes from Mountain Comprehensive Care Center. Plaintiff argues that the ALJ rejected these opinions in favor of a medical expert, who testified at the final hearing in this matter.

Plaintiff underwent a consultative psychiatric evaluation at the request of his attorney on October 12, 2003. The examiner, Dr. Eric Johnson, noted that at that time Plaintiff was using marijuana on a regular basis to help alleviate his pain. (Tr. 333). He also stated that it "was difficult to get clear information from [Plaintiff] about his psychological status." (Tr. 334). He nevertheless noted "moderate" restrictions in daily living, and detected no malingering. (Tr. 340). Dr. Johnson diagnosed Plaintiff with anxiety disorder (not otherwise specified), impulse control disorder (not otherwise specified), cannabis abuse, and paranoid personality traits. (Tr. 336). He supplied a medical assessment of ability to do work-related activities (mental), in which he opined that Plaintiff has a good ability follow work rules and maintain his personal appearance; a fair ability to deal with the public, function independently, and understand, remember, and carry out simple job instructions; and a poor ability to relate to co-workers, use judgment, interact with supervisors, deal with work stresses, maintain attention and concentration, understand, remember, and carry out

9

complex and detailed job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. 338-340).[3]

As noted by the ALJ, Plaintiff only began seeking treatment for his depression in March 2004. Treatment notes from Mountain Comp indicate that Plaintiff's mood was often anxious and depressed. (Tr. 373-85). The relative import of these records, however, is limited due to the fact that he only sought treatment for approximately two months. The ALJ, therefore, enlisted the help of a medical expert to review Plaintiff's records. Dr. Elliott Spanier provided a mental RFC, which he later revised while testifying via telephone at the final hearing. According to Dr. Spanier, Plaintiff retains the following mental RFC:

> fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, understand, remember, and carry out simple job instructions, maintain his personal appearance, and relate predictably in social situations; and poor ability understand, remember, and carry out detailed and complex job instructions, demonstrate reliability, and behave in an emotionally stable manner.

(Tr. 362-64, 467-68).

The ALJ adopted Dr. Spanier's assessment over Dr. Johnson's for several reasons. First, the ALJ noted that at the time of Dr. Johnson's evaluation, Plaintiff admitted to regular marijuana use. (Tr. 26). He also noted that Dr. Johnson stated that Plaintiff was less than fully informative about his alleged mental problems. (*Id.*). Finally, the ALJ reasoned that Dr. Spanier's opinion was more consistent with Plaintiff's short-term (and recent) mental health treatment, and based upon a review of the most recent information. Under these

---

[3]Drs. King and Muckenhausen also supplied similar assessments, which were rejected for the same reasons discussed above. (Tr. 26).

10

circumstances, the Court is unable to conclude that the ALJ erred in evaluating Plaintiff's mental RFC.

Finally, Plaintiff alleges that the ALJ erred in failing to find that his mental impairment meets or equals Listing 12.04 (affective disorders).[4] The required level of severity for these disorders is met when the "A" and "B" criteria are satisfied, or when the "C" criteria are satisfied. In this case, the ALJ found that the medical evidence established that Plaintiff exhibited some of the features of the "A" criteria of Listing 12.04. (Tr. 23). He, nevertheless, found that "a review of the relevant 'B' criteria indicates that none of the functional limitation categories are manifested at a degree which satisfies the full requirements of [the] listing." (Tr. 23). Plaintiff claims that the ALJ erred in this regard, and, in support, relies on the opinions of Dr. Johnson, Dr. Muckenhausen, and Dr. King. (Doc. #9, p. 32).

As discussed more fully above, the ALJ properly rejected the opinions of Drs. Johnson, Muckenhausen, and King.[5] Furthermore, the ALJ engaged in a thorough analysis of the "B" criteria, and based upon Dr. Spanier's report, found that Plaintiff is "mildly" restricted in his activities of daily living; experiences "moderate" difficulty maintaining social functioning and concentration, persistence, and pace; and has experienced no episodes of decompensation. (Tr. 23). He also noted that Plaintiff failed to present any evidence of

---

[4]In the introduction of his memorandum in support of his motion for summary judgment, Plaintiff argues that he meets Listing 12.04 and Listing 12.06. However, he makes no further argument regarding Listing 12.06. Nevertheless, the Court notes for the sake of completeness that Listing 12.06 would also not be met/equaled for the same reasons that 12.04 is not met (i.e., the "B" criteria are not satisfied).

[5]The Court also notes that Dr. Johnson opined that Plaintiff has only "moderate" restrictions in his activities of daily living, which, even if accepted, is insufficient to meet the listing requirements. (Tr. 340).

11

the "C" criteria.[6]  Under these circumstances, the Court concludes that the ALJ properly found that Plaintiff's depression does not meet or equal the requirements of Listing 12.04.

### III.  CONCLUSION

Accordingly, for the reasons stated,

**IT IS ORDERED** that the decision of the Commissioner is found to be supported by substantial evidence and is hereby **AFFIRMED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. #9) is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. #13) is hereby **GRANTED**.

---

[6]Paragraph "C" requires a:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.

A judgment affirming this matter will be entered contemporaneously herewith.

Dated this 22nd day of March, 2006.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\SocialSecurity\MOOs\7-04-310-BranhamMOO.wpd